UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

BRIAN BAIRD,                                              16-CV-355-LJV-MJR
                                                          REPORT AND RECOMMENDATION
                     Plaintiff,

   -v-

NANCY A. BERRYHILL,[1]
Acting Commissioner of Social Security,

                     Defendant.
_____

      This case has been referred to the undersigned by the Hon. Lawrence J. Vilardo pursuant to 28 U.S.C. §636(b)(1) for the preparation of a report and recommendation on dispositive motions. (Dkt. No. 13).

      Plaintiff Brian Baird brings this action pursuant to 42 U.S.C. §405(g) seeking judicial review of the final decision of the Commissioner of Social Security denying him Social Security Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). Both parties have moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the following reasons, it is recommended that Baird's motion (Dkt. No. 12) be granted, the Commissioner's motion (Dkt. No. 17) be denied, and this matter be remanded to the Commissioner for further administrative proceedings consistent with this Report and Recommendation.

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Nancy A. Berryhill is automatically substituted for the previously named defendant Carolyn W. Colvin. The Clerk of Court is directed to amend the caption accordingly.

**BACKGROUND**

I.   *Procedural History*

On December 4, 2012, Baird filed his DIB application alleging disability since February 29, 2012 due to gout, bipolar disorder, attention deficit hyperactivity disorder ("ADHD"), gastroesophageal reflux disease ("GERD"), right wrist pain, and lower back pain. (*See* Tr. 90, 159-67, 186).[2] Baird previously worked as a furniture installer, food vendor, and letter carrier for the United States Postal Service, but he has not worked since his alleged onset date. (Tr. 209). Baird's DIB application was denied on March 21, 2013 (Tr. 100, 106-13), after which he requested a hearing before an Administrative Law Judge (Tr. 114-15). On June 25, 2014, Baird, represented by counsel, appeared before Administrative Law Judge David S. Lewandowski (the "ALJ") for a hearing. (Tr. 59-89). On December 24, 2014, the ALJ issued his decision denying Baird's DIB claim. (Tr. 14-44). Baird requested review by the Appeals Council (Tr. 12), but on March 9, 2016, the Appeals Council denied Baird's request, making the ALJ's decision the final decision of the Commissioner (Tr. 1-4). This action followed.

II.   *Summary of the Evidence as it Relates to Baird's Mental Impairments*[3]

   A.   *Medical Evidence*

   *Nurse Greasley*

Baird visited Psychiatric Nurse Practitioner Carmella Greasley four times in 2012 for bipolar disorder and depression. (Tr. 269-90). At the final appointment in October 2012, Nurse Greasley found Baird to be anxious, superficially cooperative, angry, and

---

[2]   References to "Tr." are to the administrative record in this case.
[3]   Although Baird alleged a number of physical impairments, he does not challenge the Commissioner's disability determination as it relates to those impairments.

- 2 -

irritable. He was fully alert and oriented, and his memory was intact. His attention span and concentration were improving and his judgment and insight were fair and limited. He was not suicidal. Nurse Greasley assessed a Global Assessment of Functioning ("GAF") score of 62.[4] She noted that Baird's feelings of anger dominated the appointment, and the two discussed coping mechanisms. Nurse Greasley also recommended that Baird take a medication other than Paxil to treat his bipolar disorder, but Baird refused to do so because he did "not want to take a lot of meds." He left the appointment angry and told Nurse Greasley that he was not coming back. (Tr. 270-71).

### *Mid-Erie Counseling & Treatment Services*

In November and December 2012, Baird visited Mid-Erie Counseling & Treatment Services for a mental health assessment and treatment. He reported experiencing suicidal and homicidal ideation all the time, albeit without the intent to act. His symptoms included irritability, distractibility, mood swings, difficulty sleeping and maintaining concentration, depressed mood with suicidal and homicidal ideation, excessive worry, and "feeling on edge." His "current stressors" included difficulty obtaining employment, financial difficulties, deteriorating health, and conflict with his wife's ex-husband. On examination, Baird's mood was depressed and his affect euthymic. His thought process was appropriate but marked by depressive thoughts. His short term memory was fair, his long term memory good, and he displayed good insight and fair judgement. He was

---

[4] The GAF scale is used to report an individual's overall level of functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders ("*DSM-IV*")* at 32 (4th ed. rev. 2000). A GAF score in the range of 61 to 70 indicates "[s]ome mild symptoms (*e.g.,* depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (*e.g.,* occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *See id.* at 34.

diagnosed with bipolar disorder and generalized anxiety disorder. His GAF score was 58.[5] Baird did not return to Mid-Erie Counseling after the December 2012 appointment because he lacked "money to pay [the] copay." (Tr. 347-68).

### *Dr. Fabiano*

In January 2013, Baird visited Dr. Gregory Fabiano for a psychiatric evaluation in connection with his DIB application. On examination, Baird had a coherent and goal directed thought process with no evidence of hallucinations, delusions, or paranoia; full affect; a neutral mood; intact attention and concentration; average intellectual functioning; mildly impaired recent and remote memory skills; and good insight and judgment. Dr. Fabiano assessed depressive disorder and ADHD. He rendered the following medical source statement:

> The claimant can follow and understand simple directions and instructions. The claimant can perform simple tasks independently. The claimant can maintain attention and concentration. The claimant can maintain a regular schedule. The claimant can learn new tasks. The claimant can perform complex tasks independently. The claimant can make appropriate decisions. The claimant can relate adequately with others. The claimant can appropriately deal with stress.
>
> The results of the examination appear to be consistent with psychiatric problems, but in itself this does not appear to be significant enough to interfere with the claimant's ability to function on a daily basis.

(Tr. 397-402).

---

[5] A GAF score in the range of 51 to 60 indicates "[m]oderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers)." DSM-IV at 34.

*Dr. Echevarria*

In February 2013, Dr. Juan Echevarria, a non-examining state agency psychiatrist, opined that Baird has no restrictions in activities of daily living; mild difficulties in maintaining social functioning, concentration, and persistence or pace; and no episodes of decompensation. (Tr. 95-96).

*Nurse Bagen*

Baird received mental health counseling from Jenny T. Bagen, a psychiatric mental health nurse practitioner, between October 2013 and May 2014. (Tr. 428-29, 445-77, 491-530, 651-55). At their initial appointment in October 2013, Baird informed Nurse Bagen that his first marriage ended in divorce because he had an affair with his girlfriend. He was drinking heavily at the time and at one point planned to take his girlfriend's gun and "blow his head off." He later remarried, but he and his second wife recently went through "an abrupt and nasty breakup." In particular, in early 2013, Baird got into an argument with his second wife after she asked her father "how to get rid of him." Baird packed his suitcase, punched holes in the wall, grabbed two knives, and told his wife "to call the [p]olice so she could watch them kill him." The police came to the residence, arrested Baird, and issued a restraining order. His wife later filed for an order of protection. (Tr. 448-54).

On examination, Baird had normal speech; a dysphoric and anxious mood; a congruent, flat, and blunted affect; intact immediate and long-term memory; some difficulty with short-term memory; linear and goal directed thought organization; and limited insight and judgment. Nurse Bagen found no evidence of hallucinations or delusional thinking, although she did find some evidence of paranoia and psychotic level

obsessive-compulsive disorder ("OCD"). She assessed ADHD; "bipolar I disorder, most recent episode mixed state, chronic depression and manic features, severe with psychotic features;" intermittent explosive disorder; OCD; and a GAF score of 45.[6] (Tr. 448-54).

At a follow up appointment in early November 2013, Baird had a depressed and anxious mood; an angry and blunted affect; intact thought process; good memory; fair insight and judgment; pressured and rapid speech; and bad to fair concentration. (Tr. 456-58). Later that month, he had a depressed, anxious, and sad mood; a blunted affect; a loosening of associations with regard to his thought process; good memory; fair insight and judgment; relevant and normal speech; and fair concentration. (Tr. 463-64). At an appointment in January 2014, Baird displayed a dysthymic mood; circumstantial thought process; good memory; bad to fair insight and judgment; relevant and normal speech; and fair concentration. (Tr. 466-67). In February 2014, Nurse Baird assessed good memory; fair insight and judgment; relevant and normal speech; and fair to good concentration. (Tr. 468-70). In May 2014, she assessed a dysthymic mood; bad to fair memory; fair insight and judgment; relevant and normal speech; and fair to good concentration. (Tr. 474-77). Nurse Bagen's treatment notes also contain handwritten entries, but they are very difficult to read due to poor handwriting.

Also in May 2014, Nurse Bagen completed a "Mental Residual Functional Capacity Questionnaire." Using a check-the-box form, Nurse Bagen indicated that Baird could not meet "competitive standards" with regard to remembering work-like procedures; understanding, remembering, and carrying out very short and simple instructions;

---

[6] A GAF score in the range of 41 to 50 indicates "[s]erious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job)." DSM-IV at 34.

understanding, remembering, and carrying out detailed instructions; working in coordination with or in proximity to others; completing a normal workday and workweek without interruptions from psychologically based symptoms; performing at a consistent pace; accepting instructions and responding appropriately to criticism from supervisors; getting along with coworkers and peers; setting realistic goals or making plans independently; and dealing with stress of skilled or semi-skilled work.  Nurse Bagen further found Baird "seriously limited" in his ability to maintain attention for two-hour segments; maintain regular attendance and punctuality; sustain an ordinary routine without special supervision; respond appropriately to changes in a routine work setting; deal with normal work stress; be aware of normal hazards; interact appropriately with the general public; and maintain socially appropriate behavior.  Nurse Bagen also found that Baird had limited but satisfactory ability to make simple work-related decisions; ask simple questions or request assistance; travel to an unfamiliar place; and use public transportation.  According to Nurse Bagen, Baird would miss about four days of work a month due to his impairments and treatment.  Nurse Bagen did not believe that Baird could engage in full-time competitive employment on a sustained basis.  (Tr. 479-83).

  B. *Administrative Hearing Testimony*

  Born in 1968, Baird was forty-five-years old on the day of the hearing.  (Tr. 62).  He completed high school without having to take any special education classes.  (Tr. 63-64).  He previously worked for a furniture company but was terminated because he could not follow directions or perform the physical requirements of the job.  (Tr. 64-65).  He also delivered mail for the Postal Service but was fired for telling his supervisor's wife that the supervisor was having an affair.  (*Id.*).  When he worked for the Postal Service, he had

problems with "misdeliveries" because he struggled to read addresses and names. (Tr. 69). He was under a lot of stress at the time because his best friend and his girlfriend's son had been killed. (*Id.*). The "biggest problem[ ]" preventing him from working now is his "head." (Tr. 70). He cannot make decisions or follow directions, and if someone gives him something to read, his mind begins to race. (Tr. 70-71). He also becomes nervous around people. (Tr. 72).

Baird testified that he lives in his friend's basement and spends his time "just try[ing] to get through the day." (Tr. 78). He visits his children and mother every so often. (Tr. 80). He watches little television because he loses track of what is going on, and he does not read because he feels the need to read everything backwards. (Tr. 79 ("I'm afraid [to read] because I read everything, I read it and I read it backwards.")).

## DISCUSSION

### I. *Scope of Judicial Review*

The Court's review of the Commissioner's decision is deferential. Under the Act, the Commissioner's factual determinations "shall be conclusive" so long as they are "supported by substantial evidence," 42 U.S.C. §405(g), that is, supported by "such relevant evidence as a reasonable mind might accept as adequate to support [the] conclusion," *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks and citation omitted). "The substantial evidence test applies not only to findings on basic evidentiary facts, but also to inferences and conclusions drawn from the facts." *Smith v. Colvin*, 17 F. Supp. 3d 260, 264 (W.D.N.Y. 2014). "Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force," the Court may "not substitute [its] judgment for that of the Commissioner." *Veino v. Barnhart*,

312 F.3d 578, 586 (2d Cir. 2002).  Thus, the Court's task is to ask "'whether the record, read as a whole, yields such evidence as would allow a reasonable mind to accept the conclusions reached' by the Commissioner." *Silvers v. Colvin*, 67 F. Supp. 3d 570, 574 (W.D.N.Y. 2014) (quoting *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982)).

Two related rules follow from the Act's standard of review.  The first is that "[i]t is the function of the [Commissioner], not [the Court], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983).  The second rule is that "[g]enuine conflicts in the medical evidence are for the Commissioner to resolve." *Veino*, 312 F.3d at 588.  While the applicable standard of review is deferential, this does not mean that the Commissioner's decision is presumptively correct.  The Commissioner's decision is, as described above, subject to remand or reversal if the factual conclusions on which it is based are not supported by substantial evidence.  Further, the Commissioner's factual conclusions must be applied to the correct legal standard. *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008).  Failure to apply the correct legal standard is reversible error. *Id.*

II.     <u>*Standards for Determining "Disability" Under the Act*</u>

A "disability" is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A).  The Commissioner may find the claimant disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work

which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." *Id.* §423(d)(2)(A). The Commissioner must make these determinations based on "objective medical facts, diagnoses or medical opinions based on these facts, subjective evidence of pain or disability, and . . . [the claimant's] educational background, age, and work experience." *Dumas v. Schweiker*, 712 F.2d 1545, 1550 (2d Cir. 1983) (first alteration in original) (quoting *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981)).

To guide the assessment of whether a claimant is disabled, the Commissioner has promulgated a "five-step sequential evaluation process."  20 C.F.R. §404.1520(a)(4). First, the Commissioner determines whether the claimant is "working" and whether that work "is substantial gainful activity."  *Id.* §404.1520(b).  If the claimant is engaged in substantial gainful activity, the claimant is "not disabled regardless of [his or her] medical condition or . . . age, education, and work experience." *Id.*  Second, if the claimant is not engaged in substantial gainful activity, the Commissioner asks whether the claimant has a "severe impairment."  *Id.* §404.1520(c).  To make this determination, the Commissioner asks whether the claimant has "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." *Id.*  As with the first step, if the claimant does not have a severe impairment, he or she is not disabled regardless of any other factors or considerations.  *Id.*  Third, if the claimant does have a severe impairment, the Commissioner asks two additional questions:  first, whether that severe impairment meets the Act's duration requirement, and second, whether the severe impairment is either listed in Appendix 1 of the Commissioner's

regulations or is "equal to" an impairment listed in Appendix 1. *Id.* §404.1520(d). If the claimant satisfies both requirements of step three, the Commissioner will find that he or she is disabled without regard to his or her age, education, and work experience. *Id.*

If the claimant does not have the severe impairment required by step three, the Commissioner's analysis proceeds to steps four and five. Before doing so, the Commissioner must "assess and make a finding about [the claimant's] residual functional capacity ("RFC") based on all the relevant medical and other evidence" in the record. *Id.* §404.1520(e). RFC "is the most [the claimant] can still do despite [his or her] limitations." *Id.* §404.1545(a)(1). The Commissioner's assessment of the claimant's RFC is then applied at steps four and five. At step four, the Commissioner "compare[s] [the] residual functional capacity assessment . . . with the physical and mental demands of [the claimant's] past relevant work." *Id.* §404.1520(f). If, based on that comparison, the claimant is able to perform his or her past relevant work, the Commissioner will find that the claimant is not disabled within the meaning of the Act. *Id.* Finally, if the claimant cannot perform his or her past relevant work, then at the fifth step the Commissioner considers whether, based on the claimant's RFC, age, education, and work experience, the claimant "can make an adjustment to other work." *Id.* §404.1520(g)(1). If the claimant can adjust to other work, he or she is not disabled. *Id.* If, however, the claimant cannot adjust to other work, he or she is disabled within the meaning of the Act. *Id.*

The burden through steps one through four described above rests on the claimant. If the claimant carries his burden through the first four steps, "the burden then shifts to the [Commissioner] to show there is other gainful work in the national economy which the claimant could perform." *Carroll*, 705 F.2d at 642.

### III. *The ALJ's Decision*

The ALJ followed the required five-step analysis for evaluating disability claims. Under step one, the ALJ found that Baird has not engaged in substantial gainful activity since February 29, 2012, his alleged onset date. (Tr. 19). At step two, the ALJ concluded that Baird has the following severe impairments: "right knee patellar tendon tear, status post repair; right wrist scapholunate ligament tear; degenerative changes of the lumbar and cervical spines; asthma; depressive disorder; bipolar disorder; and attention deficit hyperactivity disorder ("ADHD")." (*Id.*). At step three, the ALJ found that Baird does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. (Tr. 22). Before proceeding to step four, the ALJ assessed Baird's RFC as follows:

> [T]he claimant has the residual functional capacity to perform sedentary work as defined in [20 C.F.R. §404.1567(a)][7] except he could perform occasional postural activities, but cannot climb ladders, ropes or scaffolds. He can occasionally handle using his right, dominant upper extremity. He can occasionally reach overhead bilaterally. The claimant can occasionally flex, extend, and rotate his neck. He should avoid hazards. He should also avoid exposure to pulmonary irritants. The claimant can understand, remember, and carry out simple instructions and perform simple tasks. He can occasionally interact with coworkers and supervisors, but cannot interact with the general public. He can occasionally make simple decisions and simple judgment. He can learn the job through demonstration.

(Tr. 25). Proceeding to step four, the ALJ found that Baird cannot perform his past relevant work. (Tr. 36). At the fifth step, the ALJ considered Baird's age, education, work

---

[7] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. §404.1567(a).

experience, RFC, and the interrogatories completed by a vocational expert[8] to conclude that Baird can perform jobs that exist in significant numbers in the national economy, namely, Semi-Conductor Bonder, Table Worker, and Surveillance Systems Monitor. (Tr. 36-37). Accordingly, the ALJ found that Baird can successfully adjust to other work and, therefore, that he has not been under a disability within the meaning of the Act from his alleged February 29, 2012 onset date through the date of the ALJ's decision. (Tr. 37).

## IV.  *Baird's Challenge*

Baird argues that the ALJ's mental RFC assessment — at least as it relates to October 2013 through the date of the ALJ's decision — is not supported by substantial evidence because the ALJ assessed his RFC for this period without the benefit of opinion evidence. (*See* Dkt. No. 12-1 (Pltf's. Memo. of Law)). In particular, the ALJ rejected Dr. Fabiano's and Dr. Echevarria's opinions because the opinions were rendered in early 2013, before Baird's mental condition began to deteriorate in mid-to-late 2013, and he rejected Nurse Bagen's opinion because he found it inconsistent with certain parts of the record. (*See* Tr. 34-36). Having rejected all three opinions, the ALJ assessed Baird's mental RFC based upon the clinical findings in the record as well as Baird's educational and work history, subjective complaints, and daily activities. (Tr. 32). For October 2013 through May 2014, the ALJ specifically relied upon Nurse Bagen's clinical findings regarding Baird's mood, affect, attentiveness, thinking, memory, insight, judgment, speech, and concentration. (Tr. 31-32); *see also supra* at 5-6 (discussing Nurse Bagen's clinical findings).

---

[8]  At the request of the ALJ, the vocational expert completed these interrogatories after the hearing. (*See* Tr. 252-55).

An RFC assessment need not be supported by a medical source statement or formal medical opinion as long as "the record is clear and contains some useful assessment of the claimant's limitations from a medical source" from which the ALJ can assess the claimant's RFC. *Muhammad v. Colvin*, No. 6:16-cv-06369(MAT), 2017 WL 4837583, at *4 (W.D.N.Y. Oct. 26, 2017) (internal quotation marks and citations omitted); *see also Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 8 (2d Cir. 2017) (summary order). Here, because the ALJ assessed Baird's RFC after having rejected the opinions of Dr. Fabiano, Dr. Echevarria, and Nurse Bagen, the question is whether the record is clear and contains some useful assessment of the claimant's limitations from a medical source. The Court concludes that the record is far from clear and does not contain some useful assessment of Baird's mental limitations from a medical source that might have allowed the ALJ to assess Baird's mental RFC. For the period October 2013 through May 2014, the record contains mere clinical findings regarding, among other things, Baird's mood, affect, attentiveness, thinking, memory, insight, judgment, speech, and concentration. These clinical findings, which varied from appointment to appointment (*see supra* at 5-6), do not neatly correlate with any particular mental limitation. As a lay person, the ALJ should not have interpreted these clinical findings to mean that Baird retained the mental RFC to understand, remember, and carry out simple instructions, perform simple tasks, occasionally interact with coworkers and supervisors, and occasionally make simple decisions and simple judgment. *See Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) (finding that the ALJ, as a lay person, was not in a position to interpret the medical evidence).

Further undermining the ALJ's mental RFC assessment is that the ALJ rejected Nurse Bagen's opinion based upon his mistaken belief that Baird never "experienced any traumatic events." (Tr. 36). Baird suffered a traumatic event in early 2013 when he and his second wife went through "an abrupt and nasty breakup." After Baird's wife asked her father "how to get rid of" Baird, Baird packed his suitcase, punched holes in the wall, grabbed two knives, and told his wife "to call the [p]olice so she could watch them kill him." The police came to the residence, arrested Baird, and issued a restraining order. His wife later filed for an order of protection. Baird's mental condition deteriorated after this incident, and he began treating with Nurse Bagen a few months later. The ALJ also incorrectly rejected Nurse Bagen's opinion based upon his mistaken belief that Baird never missed a medical appointment. (*Id.*). The record shows that Baird missed appointments with Nurse Greasley, who then counseled Baird regarding his absences. (Tr. 271).

Due to these errors, the ALJ's post-October 2013 mental RFC assessment is not supported by substantial evidence. This case should be remanded to the Commissioner to re-evaluate Baird's post-October 2013 mental RFC, and, if necessary, further develop the record regarding Baird's mental limitations.

## **CONCLUSION**

For the foregoing reasons, it is recommended that Baird's motion for judgment on the pleadings (Dkt. No. 12) be granted, the Commissioner's motion for judgment on the pleadings (Dkt. No. 17) be denied, and this matter be remanded to the Commissioner for further administrative proceedings consistent with this Report and Recommendation.

Pursuant to 28 U.S.C. §636(b)(1), it is hereby ORDERED that this Report and Recommendation be filed with the Clerk of Court.

Unless otherwise ordered by Judge Vilardo, any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a), and 6(d) of the Federal Rules of Civil Procedure, and Local Rule of Civil Procedure 72. Any requests for an extension of this deadline must be made to Judge Vilardo.

***Failure to file objections, or to request an extension of time to file objections, within fourteen days of service of this Report and Recommendation WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.*** See *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989).

The District Court will ordinarily refuse to consider *de novo* arguments, case law, and/or evidentiary material which could have been, but were not, presented to the Magistrate Judge in the first instance. *See Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985, 990-91 (1st Cir. 1988).

Pursuant to Local Rule of Civil Procedure 72(b), written objections "shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority." ***Failure to comply with these provisions may result in the District Court's refusal to consider the objection.***

SO ORDERED.

Dated:       March 2, 2018
             Buffalo, New York

                                        */s/ Michael J. Roemer*
                                        MICHAEL J. ROEMER
                                        United States Magistrate Judge